IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| MARIJO STALLINGS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:20cv780-MHT |
| | ) | (WO) |
| DILLON MELVIN, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

Plaintiff Marijo Stallings brought this lawsuit based on diversity jurisdiction, *see* 28 U.S.C. § 1332, against defendant Dillon Melvin, seeking to recover damages for injuries she sustained in a motor-vehicle accident in which both she and Melvin were drivers. She asserts a state claim for negligence against Melvin.

Melvin moved in limine for the court to enter an order prohibiting Stallings, her attorneys, and any of her witnesses from referring to her needing or receiving future surgery. Because the court found that Dr. Gabriel Jackson's testimony regarding the likelihood of Stallings's needing more surgery was not speculative,

Melvin's motion was denied in open court.  This opinion explains why.

Under Alabama law, there can be no recovery for speculative future medical treatment and expenses.  *See Armour & Co. v. Cartledge*, 176 So. 334, 337 (Ala. 1937) (overruled on other grounds, by *Starr v. Starr*, 301 So. 2d 78 (1974)).  The court was, therefore, tasked with evaluating whether Dr. Jackson's testimony about Stallings's need for future surgery was speculative and inadmissible.

Not disputed by the parties, but important to the court's analysis, was Dr. Jackson's testimony that Stallings's "fusion surgery" was needed to address injuries she sustained from the vehicular accident.  However, the parties disputed the admissibility of two other portions of Dr. Jackson's deposition testimony.

First, Dr. Jackson was asked if he could "quantify ... the likelihood that [Stallings] would need future

2

treatment."  *See* Plaintiff's Brief (doc. 99) at 8 (Dr. Gabriel Jackson's Deposition at 30).  He responded:

> "It can be difficult to quantify.  In my opinion, each case is a bit different.  She has multilevel degenerative change.  So she has issues that were present even at the time that we did the surgery.  You know, literature varies on the topic as far as the prevalence of adjacent sediment breakdown.  I think it's generally accepted that there's an approximately 25 percent chance of having another surgery at the adjacent level within 10 years if there is known foraminal stenosis or narrowing of the space for the nerves at the adjacent levels at the time of the surgery.  So for her I think [it] would be at a minimum 25 percent. Because of her degree of degeneration she has at the other levels, it could very well be higher than that."

*Id.* (Dr. Jackson's Deposition at 30-31).  This portion of the testimony was not speculative.  Dr. Jackson provided testimony about the likelihood that Stallings would need future surgery based on a combination of his medical expertise concerning the cervical spine, the understanding of the medical community, and an individualized evaluation of Stallings's condition.  He clearly explained both what his estimation was and how he reached that conclusion.

3

Second, Dr. Jackson testified he could not quantify the degree to which Stallings's need for any future surgery was related to the fusion surgery he performed in response to her injuries in the accident or to a progression of her pre-existing degenerative condition. He testified:

> "That is a difficult answer to give.  The discs--the adjacent levels will wear down. That's almost uniform, because, again, that is the natural history of disc degeneration. We do see that people that have a fusion will have an acceleration of degeneration at the adjacent levels and potentially will need surgical procedures at the adjacent levels or will need injections or medications. Whether or not, for any specific patient, you can attribute that specifically to the fusion is--that's hard to say, but we do see that patients that have had fusions are more likely to have problems at the adjacent levels and seek out or need treatment."

Defendant's Brief (doc. 104) at 9 (Dr. Jackson's Deposition at 49-50).  This testimony discussed two things: (1) Dr. Jackson's explanation of why Stallings may need more surgery; and (2) his inability to quantify the degree to which Stallings's need for any future surgery was related to the fusion surgery and the degree

4

it was related to a progression of her pre-existing degenerative condition. Dr. Jackson attributed the increased likelihood for more surgery to BOTH Stallings's fusion surgery and her pre-existing degenerative condition. This twin attribution was not speculative. He identified both factors and explained how they increased the likelihood that more surgery may be needed. This testimony was also based on his medical expertise and an individualized evaluation of Stallings's condition. However, he was unable to quantify the relative degree to which each factor caused Stallings's need for more surgery. He explained that quantification in this context was difficult because a fusion surgery will likely accelerate degeneration. Therefore, the difficulty was due to the challenge of distinguishing between the normal degeneration that would be expected from her pre-existing condition and the degeneration that might be accelerated due to her surgery. The court must decide whether his inability to provide this

5

quantification renders any of the relevant testimony speculative and inadmissible.

Most portions of Dr. Jackson's testimony were well established. He testified based on his medical expertise and an individualized analysis of Stallings's condition that: (1) the fusion surgery was necessary due to injuries Stallings sustained from the car accident; (2) there is at least a 25 % chance she will need more surgery; and (3) the need for more surgery would be caused by both her pre-existing condition and the fusion surgery he performed. His inability to quantify the relative causality of each factor was not a basis for Melvin to escape being held accountable for not only the fusion surgery resulting from the accident but any future surgery she may need as result of the fusion surgery.

The court believed that, in determining Stallings's harms, the jury was capable of hearing Dr. Jackson's testimony and weighing its strength and his credibility, and then reaching a fair verdict after hearing from

6

counsel in their closing arguments as to what the evidence supported and what amount of non-speculative and reasonable damages should be awarded.

DONE, this the 9th day of December, 2021.

                                        /s/ Myron H. Thompson
                              UNITED STATES DISTRICT JUDGE